# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

United States Courts
Southern District of Texas
F I L E D

JAN 0 5 2026

Nathan Ochsner, Clerk of Court

**ALAN BLECHER,**

**Plaintiff,**

**-against-**

**NEMO Arms, Inc.**

**Defendant.**

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT.................................................................................1

II. JURISDICTION AND VENUE..............................................................................3

III. THE PARTIES AND RELEVANT MARKETS.....................................................5

IV. FACTUAL ALLEGATIONS.................................................................................7

    A. The Genesis of the Mark: Plaintiff's Transition from High-Stakes Legal Practice
    to Defense Manufacturing (2009–2012)............................................................7

    B. Plaintiff's Federal Authority to Manufacture (Type 07 FFL)........................8

    C. Establishment of the "High-Tech" Trade Dress and Visual
    Identity in 2012................................................................................................9

    D. Reduction to Practice: Undeniable Physical Evidence of the MONGOOSE
    System (2012–2014).........................................................................................9

    E. Commercial Scale and Market Entry: The 2015 SHOT Show Acceptance and
    Manufacturing Infrastructure..........................................................................10

    F. Continuous Development and Chain of Custody: From SolidWorks to Fusion
    360 (2014–Present)..........................................................................................11

    G. Defendant's Junior Status and Admission of 2024 Priority..........................12

H. Defendant's Willful Blindness and "Ghosting" After Receiving Notice of

Plaintiff's Superior Rights.................................................................................................14

I. Defendant's Predatory "Roll-Up" Strategy and Plaintiff's Natural Zone of

Expansion..........................................................................................................................15

J. LIKELIHOOD OF CONFUSION AND IRREPARABLE HARM...............................16

COUNT I: FEDERAL TRADEMARK INFRINGEMENT, UNFAIR COMPETITION,

AND FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a)).............................................23

COUNT II: FEDERAL TRADE DRESS INFRINGEMENT

(15 U.S.C. § 1125(a))...................................................................................................................27

COUNT III: COMMON LAW UNFAIR COMPETITION

(Texas Common Law).................................................................................................................31

COUNT IV: DECLARATORY JUDGMENT OF PRIORITY AND

NON-INFRINGEMENT (28 U.S.C. § 2201; 15 U.S.C. § 1119)................................................35

V. ALLEGATIONS SUPPORTING PRELIMINARY INJUNCTIVE RELIEF...........................38

VI. PRAYER FOR RELIEF.........................................................................................................41

JURY DEMAND.........................................................................................................................43

VERIFICATION..........................................................................................................................43

## TABLE OF AUTHORITIES

### CASES

*American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,*

    494 F.2d 3 (5th Cir. 1974)................................................................................31, 33, 34

*American Rice, Inc. v. Producers Rice Mill, Inc.,*

    518 F.3d 321 (5th Cir. 2008)...................................................................................*passim*

*Blue Bell Bio-Medical v. Cin-Bad, Inc.,*

    864 F.2d 1253 (5th Cir. 1989)............................................................................27, 28, 30

*Blue Bell, Inc. v. Farah Mfg. Co.,*

    508 F.2d 1260 (5th Cir. 1975)............................................................................23, 36, 38

*Byrum v. Landreth,*

    566 F.3d 442 (5th Cir. 2009)...........................................................................................38

*Elvis Presley Enters. v. Capece,*

    141 F.3d 188 (5th Cir. 1998).......................................................................16, 24, 25, 31

*Guidry v. U.S. Tobacco Co.,*

    188 F.3d 619 (5th Cir. 1999).............................................................................................4

*Luv N' care, Ltd. v. Insta-Mix, Inc.,*

    438 F.3d 465 (5th Cir. 2006).............................................................................................3

*MedImmune, Inc. v. Genentech, Inc.*,

    549 U.S. 118 (2007)..................................................................................................35

*Paulsson Geophysical Servs., Inc. v. Sigmar*,

    529 F.3d 303 (5th Cir. 2008)....................................................................................38

*Soweco, Inc. v. Shell Oil Co.*,

    617 F.2d 1178 (5th Cir. 1980)............................................................................32, 33

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,

    532 U.S. 23 (2001)....................................................................................................29

*Two Pesos, Inc. v. Taco Cabana, Inc.*,

    505 U.S. 763 (1992)............................................................................................28, 29

*Vantage Trailers, Inc. v. Beall Corp.*,

    567 F.3d 745 (5th Cir. 2009)....................................................................................35

*Winter v. Nat. Res. Def. Council, Inc.*,

    555 U.S. 7 (2008)......................................................................................................38

*Zapata Corp. v. Zapata Trading Int'l, Inc.*,

    841 S.W.2d 45 (Tex. App. 1992)..............................................................................31

## STATUTES & RULES

15 U.S.C. § 1052(d)................................................................................................37

15 U.S.C. § 1116..............................................................................................31, 41

15 U.S.C. § 1117..........................................................................................26, 31, 42

15 U.S.C. § 1119..............................................................................................34, 37

15 U.S.C. § 1121..................................................................................................3

15 U.S.C. § 1125(a) (Lanham Act § 43(a)).........................................22, 23, 27, 37, 41

15 U.S.C. § 1127..............................................................................................23, 40

28 U.S.C. § 1331..................................................................................................3

28 U.S.C. § 1338..................................................................................................3

28 U.S.C. § 1391(b)(2)...........................................................................................4

28 U.S.C. § 2201..............................................................................................34, 35

Tex. Civ. Prac. & Rem. Code § 17.042..................................................................3, 4

## I. PRELIMINARY STATEMENT

1. This action is necessitated by the aggressive overreach and bad faith of NEMO Arms, Inc, a predatory competitor. On May 6, 2025, Defendant NEMO Arms, Inc. served Plaintiff Alan Blecher with a Cease and Desist demand explicitly threatening "legal action," claiming "willful infringement," and seeking to seize Plaintiff's established brand name (MONGOOSE) despite having no valid legal claim to it. Plaintiff responded immediately with definitive proof of his superior priority rights, specifically evidencing continuous use in commerce since 2012—more than a decade prior to Defendant's admitted first use. In a good-faith effort to avoid litigation, Plaintiff further offered a "live and let live" coexistence arrangement. Although Defendant's counsel explicitly acknowledged receipt of this dispositive evidence and promised a substantive response, Defendant instead fell silent. For eight months now, Defendant 'ghosted' the Plaintiff, never addressing the substance of Plaintiff's priority while refusing to withdraw its baseless threats and simultaneously accelerating its infringement. Defendant's refusal to engage—hoping Plaintiff would succumb to fear or uncertainty—has left Plaintiff with no choice but to seek judicial intervention to clear the cloud over his business.

2. The facts regarding priority are indisputable. For more than a decade, Plaintiff has operated as a specialized innovator in the high-end firearms industry, designing, manufacturing, and marketing the MONGOOSE weapon system. Plaintiff conceived of the mark in 2009 and reduced it to physical practice in 2012 at his manufacturing facility in Dickinson, Texas. Since that time, Plaintiff has continuously cultivated the MONGOOSE brand as a symbol of elite research and development. In direct contrast, Defendant is a corporate latecomer that admitted in its own correspondence that it did not

1

acquire any rights in the mark until "at least January 2024"—fully twelve years after Plaintiff established the brand.

3.  Despite being the junior user by more than a decade, Defendant has engaged in a willful campaign to usurp Plaintiff's identity. Defendant did not merely happen upon the name "MONGOOSE"; it misappropriated the entire visual soul of Plaintiff's brand. Defendant adopted a logo utilizing a squared-off, gapped, sci-fi typeface that is visibly and algorithmically indistinguishable from the specific trade dress Plaintiff has used since 2012. This mimicry is so precise that computer vision algorithms identify Plaintiff's long-standing font as the match for Defendant's typeface. This is a calculated attempt to bypass the years of engineering and goodwill-building undertaken by Plaintiff and to "pass off" Defendant's goods as having the pedigree of the Senior User.

4.  The resulting likelihood of confusion is overwhelming. By deploying the identical word mark, clothed in the identical trade dress, to target the identical 'high-end ultra-lightweight' consumer niche, Defendant has replicated every salient 'digit of confusion.'

5.  The resulting commercial impression is calculated to deceive consumers at every level of sophistication. This deception is uniquely potent given the parties' known market roles: Defendant is a corporate aggregator that acquires independent innovators (e.g., 2A Armament), while Plaintiff runs a specialized design house that creates platforms for other manufacturers. Consequently, even the most discerning industry insider—seeing the identical name and identical visual identity—will naturally assume that Defendant has acquired or licensed Plaintiff's technology. Defendant is trading not just on the name, but on the inevitable assumption of a corporate transaction that never occurred.

2

6. Defendant's conduct must be viewed in the context of its broader corporate strategy. Defendant is currently engaged in an aggressive "roll-up" of the "High-End Ultra-Lightweight" firearms market, evidenced by its recent acquisition of Plaintiff's direct competitor, 2A Armament. Defendant's misappropriation of the MONGOOSE mark and trade dress is a component of this strategy: an attempt to steamroll independent innovators and dominate the niche through market saturation and legal bullying. Plaintiff brings this action to stop this predation, to obtain a Declaratory Judgment confirming his status as the Senior User, and to enjoin Defendant from continuing to profit from a brand it did not build.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 (Lanham Act) and 28 U.S.C. §§ 1331 and 1338.

8. This Court has personal jurisdiction over Defendant because Defendant conducts systematic and continuous business within the State of Texas. This Court has personal jurisdiction over Defendant because Defendant falls within the ambit of the Texas Long-Arm Statute, **Tex. Civ. Prac. & Rem. Code § 17.042**. Specifically:

   a. **Doing Business:** Defendant conducts systematic and continuous business within the State of Texas by placing its firearms into the stream of commerce with the expectation that they will be purchased by consumers in this District. As the Fifth Circuit stated in *Luv N' care, Ltd. v. Insta-Mix, Inc.*: "Where a defendant knowingly benefits from the availability of a particular state's market for its products, it is only fitting that the defendant be amenable to suit in that state." 438 F.3d 465, 470 (5th Cir. 2006). Defendant's connection between the infringing

3

product and the forum state is sufficient to confer personal jurisdiction. *Id.* at 473.
Upon information and belief, Texas represents a substantial market for
Defendant's products. Defendant markets, sells, and ships infringing firearms
through authorized dealers located throughout the Southern District of Texas.
Defendant has purposefully availed itself of the privilege of conducting business
in this forum.

b. **Commission of a Tort:** Jurisdiction is authorized under § 17.042(2) because
Defendant has committed a tort, in whole or in part, in this state. Trademark
infringement and unfair competition are tortious acts. By intentionally
misappropriating the MONGOOSE mark and directing infringing goods into the
stream of commerce in Texas, Defendant has caused injury to Plaintiff's goodwill,
reputation, and business interests, which are located and felt within this District.
As the Fifth Circuit held in *Guidry v. U.S. Tobacco Co.*: "When a nonresident
defendant commits a tort within the state, or an act outside the state that causes
tortious injury within the state, that tortious conduct amounts to sufficient
minimum contacts with the state... to exercise personal adjudicative jurisdiction
over the tortfeasor." 188 F.3d 619, 628 (5th Cir. 1999).

9. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)(2)
because a substantial part of the events giving rise to the claim occurred in this District.
Specifically:

a. **Origin of Rights:** Plaintiff's priority rights in the **MONGOOSE** mark and Trade
Dress were conceived, developed, and physically reduced to practice at Plaintiff's

4

former manufacturing facility located at 1821 Dickinson Ave., Dickinson, Texas, which is within this Judicial District.

b. **Residence of the Senior User:** Plaintiff Alan Blecher, the creator and owner of the priority rights in the mark, resides and is domiciled within this Judicial District (Houston, Texas).

c. **Location of Evidence:** Substantial physical evidence, including original prototypes, tooling, and key third-party witnesses (former designers and machinists) necessary to adjudicate priority, are located within this District.

d. **Infringement:** Defendant has sold and continues to offer for sale infringing goods to residents of this District.

## III. THE PARTIES AND RELEVANT MARKETS

10. Plaintiff Alan Blecher ("Plaintiff") is an individual and a citizen of the State of Texas, with his domicile in Houston, Texas. Plaintiff is the founder of Blecher Precision, LLC and Blecher LLC, and is the specialized designer and manufacturer of high-performance firearm components, specifically known for his advanced, lightweight, upper receiver kits. Plaintiff is the senior user and common law owner of the trademark MONGOOSE and its associated trade dress, having personally conceived and continuously used the mark in commerce since 2012.

11. Defendant NEMO Arms, Inc. ("Defendant") is a corporation organized and existing under the laws of the State of Montana, with its principal place of business located at 2820 Brandt Ave, Nampa, Idaho 83687. Defendant is registered to conduct business in the State of Idaho as a Foreign Business Corporation. Defendant creates, manufactures,

5

markets, and sells firearms and firearm components throughout the United States, including substantial sales and business activities within this Judicial District. Defendant's registered agent for service of process in Idaho is Gravis Law, PLLC, located at 1661 W Shoreline Dr, Ste 200, Boise, ID 83702.

12. **The Specialized "Ultra-Lightweight" Market Sector:** Both Plaintiff and Defendant operate not merely within the general firearms industry, but within the highly specialized and boutique "High-End Ultra-Lightweight" market sector. This niche is characterized by:

    a. **Advanced Metallurgy and Manufacturing:** The use of titanium, aluminum, lithium-aluminum alloys, and proprietary machining techniques to reduce weight without sacrificing structural integrity.

    b. **Skeletonization and Architecture:** Complex, non-standard receiver geometries designed to shave ounces, often costing 300% to 500% more than standard "mil-spec" components.

    c. **The "Ounce-Counting" Consumer:** A consumer base that cares deeply about component weights, manufacturing pedigree, and aesthetic design.

13. **Defendant's Aggressive Entry into Plaintiff's Niche:** Defendant's recent corporate behavior confirms its intent to dominate this specific "Ultra-Lightweight" sector. Defendant recently acquired 2A Armament, a manufacturer previously renowned as a direct competitor to Plaintiff in the lightweight receiver and titanium component market. By acquiring 2A Armament and absorbing its "Balios-Lite" and titanium product lines, Defendant has signaled a strategic pivot to corner the market on lightweight, high-end AR platforms.

6

14. **Inevitable Confusion:** Plaintiff's MONGOOSE system (specifically the "1.36" variant) is explicitly marketed on its lightweight capabilities (2.418 lbs assembled). Defendant's use of the identical MONGOOSE mark on a 9mm PCC—marketed to the exact same demographic of lightweight enthusiasts, and sold alongside their newly acquired 2A Armament lightweight lines—creates a perfect storm for consumer confusion. A consumer looking for the "lightweight Mongoose system" they heard about on forums (Plaintiff's product) is now funneled directly to Defendant's website, where they find a "Mongoose" PCC sold by a company known for buying up lightweight tech.

## IV. FACTUAL ALLEGATIONS

### A. The Genesis of the Mark: Plaintiff's Transition from High-Stakes Legal Practice to Defense Manufacturing (2009–2012)

15. The origins of Plaintiff's MONGOOSE mark and its distinct "High-Tech" trade dress are rooted in Plaintiff's establishment of a sophisticated, well-capitalized commercial enterprise.

16. In 2009, Plaintiff Alan Blecher—an individual with a dual background in engineering/physics, Mergers & Acquisitions at Kirkland & Ellis LLP (New York), and Securities Law at Stikeman Elliot LLP (Toronto)—left the legal practice to pursue professional-grade weapons manufacturing full-time.

17. It was during this foundational period in 2009 that the mark "MONGOOSE" was conceived and adopted to identify a specific line of upper receiver kits and firearm systems.

18. Plaintiff's commercial operations were formalized and rapidly scaled between 2011 and 2012.

19. Operating through a predecessor-in-interest, Blecher Precision, LLC, Plaintiff leased a 2,000-square-foot industrial manufacturing facility at 1821 Dickinson Ave., Dickinson, Texas. By 2012, Plaintiff had fully operationalized his manufacturing capabilities with the purchase of three CNC machines to begin the reduction to practice of the MONGOOSE system.

## B. Plaintiff's Federal Authority to Manufacture (Type 07 FFL)

20. Plaintiff's operations during this foundational period were advanced, legitimate, federally regulated and authorized manufacturing activities.

21. Between 2012 and 2014, Plaintiff (operating through his commercial entity) held a Federal Firearms License (FFL) Type 07.

22. This specific license class designates the holder as a Manufacturer of Firearms, distinct from a mere dealer or gunsmith. Possession of the Type 07 FFL confirms that from the very inception of the MONGOOSE brand, Plaintiff possessed the legal authority and regulatory status to manufacture serialized firearms and complete weapon systems.

23. Thus, Plaintiff has legally occupied the exact same trade channel—firearms manufacturing—as Defendant since 2012, rendering any distinction between "parts" (such as upper receivers) and "firearms" (such as lower receivers subject to more regulation) legally moot.

8

### C. Establishment of the "High-Tech" Trade Dress and Visual Identity in 2012

24. It was during this specific timeframe—twelve years prior to Defendant's alleged first use—that Plaintiff established the distinct Trade Dress and Visual Brand Identity that Defendant has now misappropriated.

25. Evidence from 2012, including a business card contemporaneously stapled to a provisional patent application for a separate system (Model 48), establishes Plaintiff's adoption of the "Ethnocentric" typeface—a distinct, squared-off, futuristic, and "sci-fi" style font intended to convey advanced R&D capabilities. This business card features Plaintiff's Lion Logo and the exact "techno-industrial" aesthetic that Defendant NEMO Arms would inexplicably mimic over a decade later.

26. This business card explicitly lists Plaintiff's manufacturing address at 1821 Dickinson Ave., Dickinson, Texas. Because Plaintiff occupied this facility specifically during the 2011–2014 timeframe, the physical card serves as forensic authentication that the Trade Dress was established and in commerce more than a decade before Defendant's entry.

### D. Reduction to Practice: Undeniable Physical Evidence of the MONGOOSE System (2012–2014)

27. Plaintiff's priority is further cemented by undeniable physical evidence of the MONGOOSE product itself. On **September 28, 2012**, Plaintiff achieved the physical **reduction to practice** of the MONGOOSE system. Plaintiff manufactured a 3D-printed prototype of the upper receiver and contemporaneously documented the engineering process through photography, specifically capturing the disassembly of standard components designated for integration into the proprietary chassis.

28. This evidence confirms that the MONGOOSE was well past the concept stage and was already a tangible good in active development for commerce nearly twelve years prior to Defendant's first alleged use.

29. Plaintiff's use of the mark and specific Trade Dress remained continuous and consistent. On **February 22, 2014**, Plaintiff documented a custom-manufactured mousepad featuring the company logo and the same distinct "Ethnocentric" font, further reinforcing the brand identity in the workspace.

30. By **April 4, 2014**, development had progressed from polymer to metal, evidenced by photographs of a CNC-machined aluminum MONGOOSE upper receiver pictured alongside a bullpup configuration.

31. The summer of 2014 represented a period of intense commercial activity and finalization of the product. On **July 16 and July 17, 2014**, Plaintiff documented the MONGOOSE upper receiver (machined, un-anodized) mounted on a lower receiver from multiple angles.

32. On **July 18, 2014**, a photograph was taken in Plaintiff's corporate office showing Jonathan Blecher (then 13 years old) holding the newly machined MONGOOSE firearm, serving as irrefutable proof of the product's existence and the timeline of development.

**E. Commercial Scale and Market Entry: The 2015 SHOT Show Acceptance and Manufacturing Infrastructure**

33. By July 2014, Plaintiff was not merely prototyping, but preparing for a global market debut. On **July 29, 2014**, Plaintiff sent a detailed application email to the organizers of the **SHOT Show** (Chris and Dave), the firearms industry's premier trade event.

34. This correspondence confirms that Plaintiff was "planning and preparing for our debut at the Shot Show for many years," was in the "final stages of testing and prototyping," and had established a massive manufacturing footprint.

35. The email details a team of 15 staff members—including four designers, a full-time CNC programmer, and five machinists—working "60-hour weeks." It further lists the facility's capabilities, which by then had expanded to 5,000 square feet and included ten CNC machines, consisting of three horizontal machining centers for production, 5-axis vertical machining centers, and wire/sinker EDM machines.

36. Furthermore, the correspondence confirms that by 2014, the Plaintiff's aggressive R&D culture had already generated a portfolio of over 30 Projects, including many of which were Patents Pending, and projects for which other Intellectual Property protection would later be sought, evidencing a level of technical sophistication and intellectual property development far exceeding typical industry standards.

37. Plaintiff was subsequently **accepted and invited** to exhibit the MONGOOSE and other products at the 2015 SHOT Show, validating its status as a legitimate industry manufacturer with bona fide intent to sell.

**F. Continuous Development and Chain of Custody: From SolidWorks to Fusion 360 (2014–Present)**

38. Plaintiff's development of the MONGOOSE evolved. The original CAD files, created in SolidWorks in 2014 (and based on earlier Rhino files created in 2012), have been preserved and were migrated into Autodesk Fusion 360 in 2018 and 2020, demonstrating an unbroken chain of digital custody and continuous development

39. At every stage of CAD evolution, Plaintiff engaged in contemporaneous physical manufacturing and validation. Plaintiff consistently produced physical prototypes—machined both in-house at its dedicated facility and through specialized contract machinists—to test the iterative improvements of the MONGOOSE system. During this developmental decade, the MONGOOSE mark and the underlying technology were actively discussed and demonstrated within the firearm industrial base. Plaintiff engaged in technical dialogue regarding the MONGOOSE project with sophisticated end-users, industry contractors, and major equipment manufacturers, including representatives from HAAS Automation, for purposes of machine sourcing and optimizing production tool paths. These disclosures were conducted under strict Non-Disclosure Agreements (NDAs) and confidentiality protocols, ensuring that while the trade secrets remained protected, the association between the Plaintiff and the MONGOOSE brand was continuously reinforced and recognized by industry insiders, employees, and contractors throughout the R&D lifecycle.

40. Throughout this period, Plaintiff maintained commercial dialogue regarding the MONGOOSE project with sophisticated third parties, including former designers and machinists (corroborated by LinkedIn communications in 2017 and 2018) and representatives from HAAS Automation for purposes of machine sourcing and production scaling.

## G. Defendant's Junior Status and Admission of 2024 Priority

41. On May 6, 2025, Defendant served Plaintiff with an aggressive Cease and Desist demand, threatening immediate legal action, claiming "willful infringement," and seeking to bully the Senior User (Alan Blecher) out of the market.

12

42. However, in this very same demand letter, Defendant's counsel made a fatal admission regarding priority. Defendant explicitly stated that it had acquired rights in the mark "MONGOOSE" only since "at least January 2024." By its own written admission, Defendant is the Junior User by a margin of more than twelve years compared to Plaintiff's established 2012 priority date.

43. Plaintiff responded immediately to this unprovoked threat. On May 6, 2025, Plaintiff provided Defendant's counsel, Glenn Dickinson of LightGabler, with the specific dates of first use, details of the 2012 manufacturing origin, and evidence of Plaintiff's superior rights.

44. Despite acknowledging receipt and promising to "get back to [Plaintiff] shortly," Defendant's counsel ceased all communication. Faced with proof that it was the infringer rather than the aggrieved party, Defendant simply ceased communicating with Plaintiffs. Defendant "ghosted" the Plaintiff, while also refusing to withdraw its threats made explicit in the May 6 Cease and Desist, and while continuing to infringe.

45. In Plaintiff's same-day May 6, 2025 response, Plaintiff made a good-faith effort to resolve the dispute amicably, despite possessing superior priority rights. Plaintiff expressly offered a "live and let live approach", proposing that: (i) both parties post notices on their respective websites clarifying the distinction between the products to mitigate confusion; and (ii) Plaintiff would voluntarily refrain from using the MONGOOSE mark specifically for 9mm Pistol Caliber Carbines ("PCCs"), thereby leaving that specific caliber niche to Defendant.

46. Plaintiff explicitly stated in the correspondence: "Just as your client reserves all rights–so do I."

13

47. These offers were conditioned upon a prompt resolution and mutual respect for rights. However, Defendant's failure to respond within a reasonable time, or to respond at all—effectively "ghosting" the Plaintiff for eight months—constitutes a rejection of these overtures. Consequently, Plaintiff has formally withdrawn all offers made in the May 6, 2025 correspondence. Plaintiff is no longer bound by its voluntary restraint regarding the 9mm market. Given that Defendant has refused to acknowledge Plaintiff's priority, and given the natural zone of expansion for upper receivers, Plaintiff asserts its full rights to use the MONGOOSE mark in connection with all firearm calibers, including 9mm.

## H. Defendant's Willful Blindness and "Ghosting" After Receiving Notice of Plaintiff's Superior Rights

48. During this period of silence, rather than respecting Plaintiff's senior rights, Defendant continued to engage in a pattern of "Willful and Predatory" infringement. Defendant continued to aggressively market firearms under the MONGOOSE name and, critically, continued to utilize a logo and font style that is confusingly similar to the "Ethnocentric" Trade Dress Plaintiff established in 2012. Both fonts share a distinct, widened, squared-off, "gapped" futuristic aesthetic.

49. The visual mimicry is so precise that it is objectively verifiable by computer vision algorithms. When a screenshot of Defendant's infringing 'MONGOOSE' logo is submitted to industry-standard font identification software, the algorithm identifies Plaintiff's long-standing typeface—'Ethnocentric'—as a primary visual match for Defendant's logo. The software recognizes the identical geometric architecture, the specific 'sci-fi' styling, and the unique stylistic gaps in the letterforms common to both marks. This algorithmic confirmation demonstrates that Defendant has not merely chosen

14

a similar name, but has successfully cloned the exact visual DNA of Plaintiff's

established brand, rendering the marks virtually indistinguishable to both human and

digital eyes.

## I. Defendant's Predatory "Roll-Up" Strategy and Plaintiff's Natural Zone of Expansion

50. Defendant's website reveals an active strategy of corporate acquisition, specifically

referencing the recent acquisition of 2A Armament, a competitor previously known for

lightweight components. This context suggests that Defendant's infringement of

Plaintiff's mark is not accidental, but part of a calculated "roll-up" strategy to dominate

the high-end lightweight firearm market by misappropriating the branding and goodwill

of senior innovators like Plaintiff.

51. Defendant's use of the MONGOOSE mark on a 9mm Pistol Caliber Carbine ("PCC")

places it in direct conflict with Plaintiff's rights. In the firearms industry, the expansion

from manufacturing upper receiver kits to complete PCCs is the Natural Zone of

Expansion. The consumer base, manufacturing processes, and distribution channels for

high-end upper receivers and complete PCCs are identical.

52. Plaintiff has taken active steps to enter this 9mm market—a move fully anticipated by its

long-standing manufacturing capabilities. By squatting on the MONGOOSE mark in the

9mm category, Defendant is attempting to wall off the Senior User's legitimate and

natural growth, necessitating this action to protect the public from confusion and Plaintiff

from the theft of its twelve-year-old brand identity.

15

## J. LIKELIHOOD OF CONFUSION AND IRREPARABLE HARM

53. Under the law of this Circuit, in determining whether a likelihood of confusion exists, a court considers the following factors: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008). "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.'" *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) (quoting *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)).

54. In this case, all of these factors weigh heavily in favor of Plaintiff.

55. **Strength of the Plaintiff's Mark:** "Strength of a trademark is determined by two factors. The first factor considers where the mark falls on a spectrum: 'Marks may be classified as generic, descriptive, suggestive, or arbitrary and fanciful . . . . [W]ithin this spectrum the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks.' The second factor is the standing of the mark in the marketplace." *American Rice,* , 518 F.3d at 330 (quoting *Oreck Corp v. U.S. Floor Systems, Inc.*, 803 F.2d 166, 170 (5th Cir. 1986)).

56. "MONGOOSE" is an arbitrary and fanciful term when applied to firearms. It is not descriptive; it describes neither the components nor the function of the weapon. As Alan Blecher documented in correspondence with Defendant's counsel, the mark was selected in 2012 specifically for its arbitrary and metaphorical characteristics: the Mongoose is an

16

"avowed snake killer" that, while appearing to be easy prey, is actually a lethal predator. This specific conceptual selection confirms that the mark bears no intrinsic connection to the underlying goods.

57. Under Fifth Circuit precedent, such arbitrary marks are inherently distinctive and "the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks." *Id.*

58. Plaintiff's continuous use of the mark since 2012, including with big players in the industry and in related manufacturing industries, has generated significant commercial strength within the relevant high-end sector.

59. **Similarity of Design Between the Marks:** The marks are legally identical in text: MONGOOSE. The mark used by Defendant—MONGOOSE—is identical in sound, meaning, and commercial impression to Plaintiff's senior mark.

60. Moreover, the visual design of the marks is strikingly similar. Plaintiff has utilized the "Ethnocentric" typeface—a distinct, squared-off, futuristic font—as its trade dress since 2012. Defendant has adopted a virtually identical "Sci-Fi/Techno" font for its infringing mark. This visual mimicry creates a unified commercial impression, leading consumers to believe the products share a common origin.

61. Defendant's adoption of a squared, futuristic, "gapped" typeface creates a visual impression that is virtually indistinguishable from Plaintiff's established "Ethnocentric" Trade Dress.

62. Even computer algorithms that specialize in font detection and identification suggest the identity of the font of Nemo's mark as a potential match of Plaintiff's "Ethnocentric" typeface.

17

63. **Similarity of the Products:** Both parties operate in the "High-End Ultra-Lightweight" tactical firearms niche. Plaintiff manufactures upper receiver kits, lightweight firearms for human and autonomous users, etc. Defendant manufactures complete rifles and has recently expanded into the 9mm Pistol Caliber Carbine ("PCC") market. In the firearms industry, upper receivers and complete rifles are complementary goods often sold by the same manufacturers. Furthermore, Plaintiff's entry into the 9mm PCC market places the goods in direct, identical competition.

64. As Plaintiff's technical analysis confirms, both the Plaintiff's MONGOOSE and Defendant's infringing MONGOOSE share a highly specific, non-standard engineering DNA that goes far beyond generic AR-15 similarities:

   a. Both systems utilize advanced "bufferless" recoil systems, and neither requires the standard extension tube that is required with normal AR15 design designs, including those chambered in 9mm.

   b. Both weapons are "braced pistols" capable of firing with the brace folded or retracted—a specific high-value capability sought by the relevant consumer base.

   c. The brace on the Nemo product folds and the brace on the Blecher LLC product retracts or folds depending on which brace is purchased with the gun. Both of the guns can also be fired with no brace attached at all.

   d. Both take standard AR15 grips and both have the ability to take detachable standard capacity magazines (e.g., 30 rounds).

   e. Both use AR15-style lower receivers.

   f. Both upper receivers connect to the lower receiver by means of two captive take down pins.

g.   Both use standard AR15 trigger components including the selector, the trigger, the disconnector and the hammer. A consumer trained on Plaintiff's system would find Defendant's system mechanically identical in operation.

h.   Both platforms feature full-length Picatinny top rails.

i.   Both have M-LOK cutouts on the front rail.

j.   Both have reversible, forward charging handles.

k.   Both have quick-change barrel designs.

l.   Just as the standard AR15 platform can be chambered in 9mm, the Blecher LLC Mongoose can do so by simple means of using a standard AR15 in 9mm lower receiver, the corresponding magazine, and by quickly switching out the barrel and the bolt to take 9mm.

m.   Both are known for their lightweight approach and both are very compact designs.

n.   Both are under 15" long.

o.   Both have last round bolt hold open, and both use the same style of bolt catch.

p.   Both can be outfitted with rear plates with 1913 rails (Picatiny), such as in place of a brace or stock.

q.   Both systems accept the same industry-standard accessories (e.g., SB Tactical FS1913 folding braces via rear Picatinny plates) and magazines.

r.   Both the Nemo product and the Blecher LLC Mongoose use delayed recoil operation in the 9mm chambering.

65. **Direct Competition in the 9mm Sector:** Plaintiff has taken concrete steps to expand the MONGOOSE product line into the 9mm Pistol Caliber Carbine (PCC) market, a natural and anticipated zone of expansion for a manufacturer of AR-15 upper receivers.

Defendant's use of the MONGOOSE mark on a 9mm PCC places the parties' goods in direct, irreconcilable conflict.

66. **Identity of Retail Outlets and Purchasers:** Both parties market to the same specific demographic: firearm enthusiasts who prioritize weight reduction ("ounce-counters"), advanced metallurgy, and premium machining. Both parties transact business through interactive websites and distribute products through specialized high-end firearm dealers.

67. **Similarity of Advertising Media Used:** Both parties utilize the internet, social media platforms, and industry trade shows (specifically the **SHOT Show**) to reach their customer base.

68. **The Defendant's Intent:** Evidence of Defendant's intent is perhaps dispositive. Defendant's own Cease and Desist letter of May 6, 2025, proves that Defendant had actual knowledge of Plaintiff's mark and considered it confusingly similar. Upon receiving proof of Plaintiff's priority (dating back to 2012), Defendant did not cease use; instead, it "ghosted" the Plaintiff and accelerated its intent to dominate the lightweight sector, including its actual acquisition and subsequent integration of competitors (e.g., 2A Armament), potential future intended acquisitions and or integrations of competitors, and marketing of the infringing product. This conduct supports an inference that Defendant intended to trade on the goodwill of the Senior User to facilitate its corporate expansion. As held in *American Rice*, "if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff], that fact alone may be sufficient to justify the inference that there is confusing similarity." *American Rice*, 518 F.3d at 332 (quoting *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 703–04 (5th Cir. In 1981).

69. **Willful Disregard:** Defendant's conduct—specifically its failure to respond to Plaintiff's notice of priority while simultaneously accelerating its use of the infringing mark, continuing with marketing without any clarification on the origin of the goods—demonstrates a willful, malicious, and predatory intent to usurp Plaintiff's intellectual property rights.

70. **Actual Confusion and Reverse Confusion:** Given Defendant's aggressive expansion and larger corporate footprint, there is a severe risk of **Reverse Confusion**, where consumers mistakenly believe that Plaintiff—the Senior User—is the infringer, or that Plaintiff has been acquired by Defendant as part of its "roll-up" strategy. "Although actual confusion is the 'best evidence,' of confusion, it 'is not necessary to a finding of likelihood of confusion.'" *American Rice*, 518 F.3d at 329 (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980)).

71. **Evidence of Actual Reverse Confusion (Accusations Against Plaintiff):** The likelihood of confusion has already ripened into actual damage to Plaintiff's reputation. Plaintiff has observed instances in public online forums, industry discussion boards, and elsewhere, where third-party consumers—misled by Defendant's market saturation and appropriation of the Trade Dress—have accused Plaintiff of infringing Defendant's rights. This turns the factual reality on its head. Because Defendant has flooded the market with the infringing mark, the public creates a false chronology, assuming the larger entity (Defendant) is the innovator and the smaller entity (Plaintiff) is the imitator. This unjust inversion of status forces the true Senior User to defend his integrity against baseless accusations of theft, causing incalculable reputational harm.

21

72. Consumers encountering Plaintiff's senior MONGOOSE products are likely to mistakenly believe that Plaintiff is the infringer, or that Plaintiff has been acquired by Defendant. This effectively strips Plaintiff of the goodwill it has cultivated since 2012 and allows Defendant to overwhelm the senior user through market saturation.

73. Plaintiff has no control over the quality, safety, or reliability of Defendant's firearms. Any defect, malfunction, or negative consumer experience associated with Defendant's "Mongoose" PCC will inevitably be attributed to Plaintiff, causing incalculable damage to Plaintiff's reputation as a premier industry innovator and R&D specialist.

74. **Degree of Care Exercised by Potential Purchasers:** While purchasers of high-end firearms are generally discerning, the identical nature of the name "MONGOOSE" combined with the identical "Ethnocentric" visual styling renders even a careful consumer unable to distinguish the source.

75. When a larger entity (Defendant) mimics the exact branding of a boutique innovator (Plaintiff), even sophisticated buyers are likely to assume a corporate affiliation or acquisition has occurred.

76. This is especially true given the specific commercial reputations of the parties. Defendant is publicly known to be aggressively consolidating the market through planned or actual acquisition (e.g., 2A Armament). Conversely, Blecher LLC is recognized within the industry as a specialized design house and R&D laboratory that creates platforms for other manufacturers.

77. A sophisticated consumer—aware of Defendant's acquisition habits and Plaintiff's role as a high-level developer—will naturally assume that the "NEMO Mongoose" represents a licensed collaboration or a corporate acquisition of Plaintiff's technology, rather than an

infringing product. At every level of consumer sophistication, there is a strong basis for a finding of a likelihood of confusion.

## COUNT I

## FEDERAL TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND FALSE DESIGNATION OF ORIGIN

### (15 U.S.C. § 1125(a) / Lanham Act § 43(a))

78. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

79. **The Statutory Basis:** This claim arises under Section 43(a) of the Lanham Act, **15 U.S.C. § 1125(a)**, which imposes civil liability upon: "Any person who, on or in connection with any goods or services... uses in commerce any word, term, name, symbol, or device... which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

80. **The Legal Standard (Fifth Circuit):** To state a claim for trademark infringement under this statute, Plaintiff must satisfy a two-part test. As stated in *American Rice,*: "a plaintiff must first show that the mark is legally protectable and must then establish infringement by showing a likelihood of confusion." 518 F.3d at 329.

81. **Plaintiff's Priority and Senior User Status:** Under the established law of this Circuit, "[t]he exclusive right to a trademark belongs to one who first uses it in connection with specified goods." *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975).

Plaintiff is the Senior User of the MONGOOSE mark. Plaintiff is the "one who first use[d] [the mark] in connection with" the goods.

82. As detailed above, Plaintiff achieved a "bona fide use of a mark in the ordinary course of trade" (15 U.S.C. § 1127) as early as 2012 through the manufacturing of prototypes, and certainly by 2014 through the active marketing and acceptance to the SHOT Show. In contrast, Defendant has admitted in writing that its rights did not accrue until "at least January 2024," rendering Defendant the Junior User by a margin of over a decade.

83. **Protectable Mark:** The mark MONGOOSE is arbitrary and fanciful when applied to firearms and firearm components, as the animal has no intrinsic connection to the mechanical function of a weapon. Under Fifth Circuit precedent, such marks are inherently distinctive and "the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks." *American Rice*, 518 F.3d at 330. Consequently, Plaintiff possesses a valid and protectable interest in the mark.

84. **Likelihood of Confusion:** Defendant's use of the identical mark MONGOOSE in connection with identical or highly related goods (firearms and firearm components) creates a likelihood of confusion among consumers as to the source, affiliation, or sponsorship of the goods. Applying the "Digits of Confusion" recognized by this Circuit, the likelihood of confusion is overwhelming:

    a.  **Strength of Mark:** Plaintiff's mark is arbitrary and strong.

    b.  **Similarity of Design:** The marks are legally identical in word ("MONGOOSE") and visually virtually indistinguishable in font style. As the Fifth Circuit has noted, "[t]he context of the presentation of a mark... is relevant to the meaning

24

that the mark conveys." *Elvis Presley Enters.*, 141 F.3d at 197. Defendant's

adoption of a "High-Tech" trade dress identical to Plaintiff's creates a unified

commercial impression of affiliation.

    c. **Similarity of Product:** Both parties produce high-end, lightweight tactical

      firearm systems, as discussed at length above.

    d. **Identity of Retail Outlets and Purchasers:** Both parties market to sophisticated

      "ounce-counting" enthusiasts through interactive websites and specialized dealers.

85. **Natural Zone of Expansion:** Furthermore, "the danger of affiliation or sponsorship

confusion increases when the junior user's services are in a market that is one into which

the senior user would naturally expand." *Elvis Presley Enters.*, 141 F.3d at 202. Plaintiff's

expansion from upper receivers or complete firearms to 9mm Pistol Caliber Carbines is a

natural, anticipated, and logical expansion of its business, especially considering that

Plaintiff actively targets the consumer market, the chief end user of 9mm PCC carbines.

Defendant's use of the mark on 9mm PCCs blocks this natural expansion and ensures

consumer confusion.

86. While military procurement priorities focus largely on intermediate rifle cartridges (e.g.,

5.56mm), the commercial civilian market—one of Plaintiff's key demographics—is the

undisputed driver of demand for 9mm PCC platforms, driven by the economics of

ammunition and the popularity of civilian competitive shooting disciplines (e.g.,

USPSA). Consequently, the "average consumer" in the commercial sector expects a

high-end manufacturer of precision AR components to offer a 9mm PCC variant.

Defendant's use of the mark on 9mm PCCs therefore blocks this natural commercial

evolution and ensures consumer confusion.

87. **Defendant's Intent and Willfulness:** Defendant's infringement is willful. Defendant's intent is a "critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of (the plaintiff,) that fact alone may be sufficient to justify the inference that there is confusing similarity." *American Rice*, 518 F.3d at 332. Defendant's conduct—specifically (1) initiating a Cease and Desist, (2) receiving proof of Plaintiff's priority, (3) "ghosting" the Plaintiff, and (4) those actions begin close in temporal proximity with its acquisition of competitors (2A Armament), and (5) then, with full knowledge of infringement, continuing and accelerating its plan to dominate the lightweight niche in an infringing fashion—demonstrates a predatory intent to usurp Plaintiff's goodwill and overwhelm the Senior User.

88. Defendant's conduct further evidences a 'Paper Tiger' strategy of bad faith enforcement. Upon information and belief, Defendant realized immediately upon receipt of Plaintiff's May 6, 2025 response that Plaintiff possessed superior priority rights dating back to 2012. Yet, instead of ethically withdrawing its baseless threats, Defendant chose to remain silent, gambling that Plaintiff—as a smaller entity—labored under a legal misunderstanding regarding the superiority of common law rights. Defendant hoped that Plaintiff, intimidated by the specter of a larger corporate adversary, would surrender its rights out of fear or ignorance, even though Plaintiff had no legal obligation to do so. Defendant's refusal to formally withdraw a threat it knew to be legally meritless was calculated to force capitulation through intimidation, or simply to avoid the embarrassment of admitting its own lack of due diligence.

89. **Damage and Statutory Remedies:** As a direct and proximate result of Defendant's acts, Plaintiff has suffered and will continue to suffer irreparable harm to its business,

reputation, and goodwill. Pursuant to **15 U.S.C. § 1117(a)**, Plaintiff is entitled to recover

(1) Defendant's profits, (2) any damages sustained by the Plaintiff, and (3) the costs of

the action. Furthermore, because Defendant's conduct in "ghosting" the Plaintiff and

continuing to infringe after notice constitutes an "exceptional case" of willful

infringement, Plaintiff is entitled to an award of reasonable attorney's fees. As the Fifth

Circuit has held, "[t]he purpose of section 1117 is to take all the economic incentive out

of trademark infringement." *American Rice*, 518 F.3d at 339 (citing *Rolex Watch USA,*

*Inc. v. Meece*, 158 F.3d 816, 824 (5th Cir. 1998)).

## COUNT II

## FEDERAL TRADE DRESS INFRINGEMENT

## (15 U.S.C. § 1125(a) / Lanham Act § 43(a))

90. Plaintiff repeats and realleges each and every allegation contained in the preceding

paragraphs as if fully set forth herein.

91. **The Legal Standard (Fifth Circuit):** To state a claim for trade dress infringement under

15 U.S.C. § 1125(a), the Fifth Circuit requires a plaintiff to conduct a specific inquiry. As

established in *Blue Bell Bio-Medical v. Cin-Bad, Inc.*:

"A court must undertake a two-step analysis to resolve a trade dress

infringement claim under the Lanham Act. The first question is whether the

product's trade dress qualifies for protection. This inquiry encompasses three

issues: (1) distinctiveness, (2) secondary meaning, and (3) functionality.

Second, if the trade dress is protected, the court must then determine whether

the trade dress has been infringed. Infringement occurs only when there is a

27

likelihood of confusion[.]" *Blue Bell Bio-Medical*, 864 F.2d 1253, 1256 (5th Cir. 1989).

92. **The Statutory Burden (Non-Functionality):** Furthermore, pursuant to 15 U.S.C. § 1125(a)(3), in a civil action for trade dress infringement, where said trade dress is not registered on the principal register, "the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."

93. As detailed herein, Plaintiff satisfies all elements: the trade dress is inherently distinctive (thereby obviating the need for proof of secondary meaning under *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773 (1992)), or in the alternative, has acquired secondary meaning through continuous use since 2012; it is legally non-functional; and its appropriation by Defendant creates a likelihood of confusion.

94. **Definition of Plaintiff's Trade Dress:** Plaintiff possesses valid and protectable trade dress rights in the "total image and overall appearance" of its branding. *Blue Bell Bio-Medical*, 864 F.2d at 1256 (citing *Falcon Rice Mill v. Community Rice Mill*, 725 F.2d 336, 337 n. 1. (5th Cir. 1984)). Specifically, Plaintiff's Trade Dress consists of a distinct visual combination comprising: (a) the consistent use of the "Ethnocentric" or substantially similar "Sci-Fi/Futuristic" typeface characterized by capitalized, squared-off lettering and stylistic gaps; (b) the widened/extended character spacing (kerning); and (c) the presentation of this typography against a stark, high-contrast (typically black or white) background to convey an aesthetic of advanced military research and development (collectively, the "High-Tech Trade Dress").

28

95. **Inherently Distinctive and Protectable:** Plaintiff's High-Tech Trade Dress is inherently distinctive. The specific combination of font style, spacing, and visual presentation is "arbitrary" and "fanciful" within the firearms industry, which traditionally utilizes utilitarian, stencil, or serif typefaces. Under *Two Pesos*, because Plaintiff's trade dress is inherently distinctive, it is "capable of identifying products or services as coming from a specific source" and is protectable under § 43(a) "without a showing that it has acquired secondary meaning." 505 U.S. at 773.

96. **Non-Functionality:** Plaintiff's Trade Dress is non-functional. Under the Supreme Court's standard in *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, a feature is functional only if it is "'essential to the use or purpose of the article or if it affects the cost or quality of the article.'" 532 U.S. 23, 32 (2001) (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U. S. 844, 850, n. 10). The use of the "Ethnocentric" typeface and futuristic styling is purely ornamental and branding-related. It is not essential to the operation of a firearm, it does not enhance the mechanical efficiency of the weapon, and it does not affect the manufacturing cost or quality of the goods. It serves solely to identify the source and distinguish Plaintiff's goods from those of others. The Trade Dress is merely an 'arbitrary flourish' in the configuration of Plaintiff's products, not the reason the device works. *TrafFix*, 532 U.S. at 34.

97. Similarly, the ancillary elements of Plaintiff's Trade Dress—specifically the stark, high-contrast visual presentation (utilizing white or metallic text against a deep black background) and the specific "R&D Laboratory" aesthetic—are legally non-functional. These visual choices do not impact the mechanical performance, weight, accuracy, or durability of the firearm. There is no engineering advantage to marketing a firearm using

29

a "Sci-Fi" aesthetic versus a traditional "Military/Tactical" aesthetic. Competitors,

including Defendant, remain free to market their goods using infinite alternative visual

combinations (e.g., earth tones, standard serif typography, or other colored backgrounds)

without being placed at a non-reputation-related disadvantage. Plaintiff's specific

adoption of this "Dark Mode" high-tech visual language is an arbitrary branding decision

designed solely to evoke a specific commercial identity, not to satisfy a utilitarian

requirement of the goods.

98. **Likelihood of Confusion:** Defendant's use of a virtually identical trade

dress—specifically, a logo utilizing a squared-off, gapped, futuristic font that computer

algorithms identify as matching Plaintiff's "Ethnocentric" typeface—creates a strong

likelihood of confusion. As the Fifth Circuit said in *Blue Bell Bio-Medical v. Cin-Bad,*

*Inc.*, trade dress infringement occurs where a competitor adopts a "total image"

confusingly similar to the plaintiff's. 864 F.2d at 1257. Here, Defendant has not only

appropriated the name "MONGOOSE" but has clothed it in the exact visual uniform

established by Plaintiff in 2012. This visual mimicry creates a subliminal association in

the minds of consumers, leading them to believe that Defendant's products are associated

with, sponsored by, or derived from Plaintiff's established R&D lineage.

99. **Intent to Copy:** The visual similarity between Plaintiff's established Trade Dress and

Defendant's infringing logo is too precise to be coincidental. Given the infinite variety of

fonts available, Defendant's selection of a typeface that mirrors the unique geometry of

Plaintiff's brand constitutes evidence of deliberate copying. Under Fifth Circuit law, such

an "intent of deriving benefit from the reputation of [the plaintiff]" "alone may be

sufficient to justify the inference that there is confusing similarity." *American Rice*, 518

F.3d at 332 (quoting *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d

695, 703–04 (5th Cir. 1981) (internal quotation omitted)).

100.   **Damage:** As a direct result of Defendant's trade dress infringement, Plaintiff has

suffered and continues to suffer damage to its brand identity, loss of distinctiveness, and

potential diversion of sales. Plaintiff is entitled to injunctive relief, disgorgement of

profits, and damages pursuant to 15 U.S.C. §§ 1116 and 1117.

## COUNT III

## COMMON LAW UNFAIR COMPETITION

## (Texas Common Law)

101.   Plaintiff repeats and realleges each and every allegation contained in the preceding

paragraphs as if fully set forth herein.

102.   **Equivalence with Federal Standards**

Under Texas law, "[a] common law trademark infringement action under Texas law

presents no difference in issues than those under federal trademark infringement actions."

*Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th

Dist.] 1992, no writ) (citing *Waples-Platter Companies v. General Foods Corp.*, 439 F.

Supp. 551, 583 (N.D.Tex. 1977)).

103.   Furthermore, the Fifth Circuit has established that unfair competition is a broad

equitable doctrine, noting that the law "is the umbrella for all statutory and nonstatutory

causes of action arising out of business conduct which is contrary to honest practice in

industrial or commercial matters." *American Heritage Life Ins. Co. v. Heritage Life Ins.

Co.*, 494 F.2d 3, 14 (5th Cir. 1974).

104.    "A determination of a likelihood of confusion under federal law is the same as the

determination of a likelihood of confusion under Texas law for a trademark infringement

claim." *Elvis Presley Enters.*, 141 F.3d at 193 (citing *Zapata*, 841 S.W.2d at 47).

105.    By establishing a likelihood of confusion under the Lanham Act (Counts I and II),

Plaintiff has simultaneously established the essential elements of unfair competition

under Texas common law.

106.    Nevertheless, independent application of the specific Texas standard is warranted to

demonstrate the calculated nature of Defendant's deception. To prevail on a claim for the

tort of unfair competition, the Plaintiff must show that "his mark is distinctive or has

acquired secondary meaning," and that the Defendant's "use of the name is calculated to

deceive the ordinary buyer making his purchases under the ordinary conditions which

prevail in the particular trade to which the controversy relates." *Soweco, Inc. v. Shell Oil

Co.*, 617 F.2d 1178, 1190 (5th Cir. 1980) (quoting *Douglas v. Taylor*, 497 S.W.2d 308,

310 (Tex. Civ. App.—Houston [1st Dist.] 1973, no writ)).

107.    As explained above, Plaintiff has shown that his mark is distinctive, or has acquired

secondary meaning.

108.    **Misappropriation of Goodwill ("Reaping Where Not Sown"):** Plaintiff, as the

Senior User, has invested over a decade of time, capital, and engineering effort (since

2012) to build the MONGOOSE brand and its associated "High-Tech" Trade Dress into a

symbol of advanced R&D and innovation. Defendant, a later entrant, has engaged in a

pattern of conduct calculated to misappropriate this goodwill. By adopting the identical

name and a virtually identical visual identity, Defendant is attempting to reap where it has

not sown, effectively bypassing the cost of establishing its own reputation for innovation by wearing the skin of the Senior User.

109. **Calculated Intent to Deceive:** Unfair competition results when the defendant's use of a name is "calculated to deceive the ordinary buyer making his purchases under the ordinary conditions which prevail in the particular trade to which the controversy relates." *Soweco*, 617 F.2d at 1190 (quoting *Douglas*, 497 S.W.2d at 310). Defendant's conduct in this matter was calculated and predatory. Specifically:

    a. Defendant identified the Plaintiff's mark (evidenced by their own Cease and Desist letter).

    b. Defendant received definitive proof of Plaintiff's priority.

    c. Defendant refused to acknowledge Plaintiff's rights or withdraw its threats ("ghosting" the Plaintiff for eight months, persisting in a strategy of non-responsiveness and ignorance of Plaintiffs superior rights).

    d. Defendant simultaneously accelerated its "roll-up" strategy by continuing its integration with Plaintiff's direct competitors (e.g., 2A Armament), continuing to saturate the market with the infringing MONGOOSE mark, and continuing to market and sell in the lightweight tactical niche in an infringing, deceitful manner.

110. **Inequitable Conduct:** This conduct goes beyond mere infringement; it constitutes an inequitable business practice designed to overwhelm a smaller, innovative Senior User through corporate inertia and market saturation. Defendant's refusal to engage in good-faith resolution after being put on notice of its junior status demonstrates a willful disregard for the orderly conduct of commerce and the rights of intellectual property owners.

111.    This specific pattern of conduct—threatening a competitor with litigation and then refusing to engage upon receipt of adverse evidence—violates the fundamental principles of 'honest practice in industrial or commercial matters' protected by the unfair competition doctrine. *American Heritage*, 494 F.2d at 14.

112.    Alternatively, Defendant's conduct demonstrates a callous and willful indifference to the intellectual property rights of others. Having initiated a legal dispute, Defendant demonstrated a reckless disregard for the orderly conduct of commerce by failing to respond to definitive proof of infringement for over eight months, never responding to the substance of Plaintiff's explanations or offer. This bureaucratic arrogance—whereby a larger entity threatens a smaller competitor and then deems it unnecessary to follow through or clarify its position—violates the fundamental tenets of fair play and "honest practice in industrial or commercial matter'" protected by the unfair competition doctrine. *Id.*

113.    **Injury to Reputation and Goodwill:** As a direct and proximate result of Defendant's unfair competition, Plaintiff has suffered injury to its reputation and the dilution of the goodwill associated with its MONGOOSE mark. Because Plaintiff cannot control the quality of Defendant's goods, Defendant's continued passing off of its products as being associated with Plaintiff creates an imminent threat of irreparable harm.

114.    **Remedies:** Plaintiff is entitled to an injunction restraining Defendant from further acts of unfair competition, as well as an award of all damages sustained by Plaintiff and the disgorgement of Defendant's profits derived from its unfair practices.

COUNT IV

DECLARATORY JUDGMENT OF PRIORITY AND NON-INFRINGEMENT

(28 U.S.C. § 2201; 15 U.S.C. § 1119)

115.    Plaintiff repeats and realleges each and every allegation contained in the preceding

paragraphs as if fully set forth herein.

116.    **The Statutory Basis:** Pursuant to **28 U.S.C. § 2201(a)**, "[i]n a case of actual

controversy within its jurisdiction," a federal court "may declare the rights and other legal

relations of any interested party seeking such declaration." The Supreme Court has held

that an actual controversy exists where "the facts alleged, under all the circumstances,

show that there is a substantial controversy, between parties having adverse legal

interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

117.    **Fifth Circuit Application:** Applying this standard, the Fifth Circuit recognizes that a

Declaratory Judgment action is the necessary remedy where a defendant has threatened

litigation but failed to file suit, leaving the plaintiff in commercial limbo. As stated in

*Vantage Trailers, Inc. v. Beall Corp.*: "An unfulfilled threat of action by the [trademark]

holder is precisely the type of bullying—warning of legal action but never bringing

suit—that the Declaratory Judgment Act sought to prevent." 567 F.3d 745, 751 (5th Cir.

2009).  Defendant's aggressive Cease and Desist letter, followed by eight months of

silence, never responding to the substance of Plaintiff's communications, constitutes

exactly this type of coercive bullying. This conduct is not merely legal posturing; it is a

calculated component of Defendant's broader commercial strategy to utilize the specter

of litigation to freeze Plaintiff's operations and stifle legitimate competition while Defendant consolidates the "High-End Ultra-Lightweight" market through acquisitions.

118. **Actual Controversy:** An actual and justiciable controversy exists between Plaintiff and Defendant regarding the ownership and priority of the MONGOOSE trademark. Defendant has expressly threatened Plaintiff with legal action for infringement, claiming superior rights in the mark. Defendant has expressly demanded, through seasoned counsel, that Plaintiff "cease and desist" use of the mark, and threatened to pursue "full remedies for damages, restitution, attorneys' fees and other relief." This threat creates a reasonable apprehension of litigation, casting a cloud over Plaintiff's business operations, expansion into the 9mm market, and commercial reputation. Defendant's threats have necessitated a judicial declaration of rights to clear the cloud over Plaintiff's business.

119. Declaratory relief is further necessitated by Defendant's apparent tactical decision to 'lie in wait.' Upon information and belief, Defendant's refusal to sue immediately—despite its aggressive C&D letter—is a calculated strategic maneuver designed to maximize potential damages. Defendant is aware that Plaintiff is aggressively pursuing high-value contracts with Prime Defense Contractors and Government entities. Defendant's silence is an attempt to allow Plaintiff to accrue sales and deepen its reliance on the mark, effectively 'fattening' the target for a future disgorgement claim or settlement once Plaintiff secures a major contract. Plaintiff cannot be forced to operate under this Sword of Damocles, risking the destruction of future government contracts by a dormant but un-withdrawn legal threat.

120. **Plaintiff's Priority and The Substantive Rule: First in Time, First in Right:** The resolution of this controversy is governed by the fundamental tenet of trademark law:

36

Priority. Under the Lanham Act and Fifth Circuit precedent, "[t]he exclusive right to a trademark belongs to one who first uses it in connection with specified goods." *Blue Bell v. Farah*, 508 F.2d at 1265. Because Plaintiff established bona fide use in commerce in 2012, and Defendant has admitted it did not acquire rights until "at least January 2024," Plaintiff is the Senior User. Plaintiff has continuously used the mark in commerce and has not abandoned it. Accordingly, Defendant has no standing to enforce the mark against Plaintiff, and Plaintiff is entitled to a judicial declaration of ownership. Plaintiff's rights are superior to Defendant's rights in every respect.

121.    **Preclusion of Defendant's Rights (15 U.S.C. § 1052(d)):** Defendant possesses no valid federal trademark rights. Pursuant to 15 U.S.C. § 1052(d), a mark is not registrable if it "so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely... to cause confusion." Because Plaintiff "previously used" the mark in the United States (since 2012) and has not abandoned it, Defendant is statutorily barred from acquiring federal registration or enforcement rights against Plaintiff.

122.    **Authority to Rectify Register (15 U.S.C. § 1119):** To the extent Defendant has filed or intends to file any application for registration of the MONGOOSE mark, this Court possesses the authority under 15 U.S.C. § 1119 to "determine the right to registration... and otherwise rectify the register." Because Plaintiff holds priority, Plaintiff's continued use of the MONGOOSE mark does not and cannot infringe upon any valid rights held by Defendant. Any confusion in the marketplace is the direct result of Defendant's junior encroachment upon Plaintiff's established rights.

123.    **Declaration Sought:** Plaintiff is entitled to a Declaratory Judgment stating that:

    a.  Plaintiff is the Senior User and lawful owner of the **MONGOOSE** trademark and associated Trade Dress;

    b.  Defendant is the Junior User;

    c.  Defendant's use of the MONGOOSE mark and the "Ethnocentric" Trade Dress constitutes trademark infringement, unfair competition, and false designation of origin under 15 U.S.C. § 1125(a) and Texas common law;

    d.  Plaintiff's use of the mark does not infringe any valid right of Defendant; and

    e.  Defendant is permanently barred from registering the MONGOOSE mark with the USPTO due to Plaintiff's superior priority.

## V. ALLEGATIONS SUPPORTING PRELIMINARY INJUNCTIVE RELIEF

124.    Plaintiff seeks a preliminary injunction to preserve the status quo and prevent the destruction of his twelve-year-old brand during the pendency of this litigation.

125.    To obtain a preliminary injunction, a Plaintiff must establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the balance of equities tips in his favor; and (4) that the granting of the preliminary injunction will not disserve the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

126.    **Substantial Likelihood of Success:** Plaintiff's likelihood of success goes beyond substantial; it is overwhelming. The dispositive issue in this case is Priority. Under Fifth Circuit law, "[t]he exclusive right to a trademark belongs to one who first uses it." *Farah*, 508 F.2d at 1265. Plaintiff has irrefutable evidence of use dating to 2012. Defendant has admitted in writing that its rights date only to 2024. Because Defendant is the Junior User

38

on an identical mark and trade dress, Plaintiff's ultimate success on the merits is a matter of black-letter law.

127. **Irreparable Harm (Loss of Control):** Plaintiff faces an immediate and existential threat of irreparable harm. While irreparable harm is not automatically presumed, it is established where the trademark owner loses control over their reputation. As the Court stated in *Paulsson Geophysical Servs., Inc. v. Sigmar*, "[w]hen a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of those goods or services." 529 F.3d 303, 313 (5th Cir. 2008) (quoting *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999)).

128. Because Plaintiff cannot control Defendant's manufacturing standards, every "MONGOOSE" sold by Defendant creates a risk to Plaintiff's reputation that cannot be undone by monetary damages. If Defendant's product fails or causes injury, that failure will be attributed to Plaintiff.

129. **Irreparable Harm (Reverse Confusion):** Furthermore, given Defendant's aggressive acquisition strategy and Plaintiff's established industry reputation as a specialized R&D design house, Plaintiff faces the specific and catastrophic harm of "Reverse Confusion." Because Plaintiff is known for creating platforms for other manufacturers, and Defendant is known for acquiring innovators (e.g., 2A Armament), Defendant's saturation of the market with the identical mark creates the false impression that Plaintiff has been acquired by Defendant or has licensed its technology to them. This effectively erases Plaintiff's identity as an independent innovator, converting his brand

equity into a subsidiary asset of the Defendant. This loss of commercial independence and distinctiveness is structurally irreparable and cannot be calculated in damages.

130. **Balance of Hardships (The "Self-Inflicted Wound"):** The threatened injury to Plaintiff outweighs any harm an injunction might cause to Defendant.

131. Defendant's harm is entirely self-inflicted and does not tip the equitable balance.

132. Defendant was put on actual notice of Plaintiff's superior rights on May 6, 2025. At that moment, Defendant had the opportunity to pause and rebrand. Instead, Defendant chose to "ghost" the Plaintiff and accelerate its production and marketing of the infringing goods. Defendant gambled that it could overwhelm the Plaintiff through volume. Having lost that gamble, Defendant cannot now use the cost of its own willful infringement as a shield against equitable relief. Any financial loss Defendant suffers from a recall is the direct result of its own calculated decision to ignore the Senior User's rights.

133. **Defendant's Minimal Rebranding Burden:** Upon information and belief, the infringing mark "MONGOOSE" is utilized primarily in marketing materials, packaging, and laser-surface etching, rather than being permanently cast or forged into the serialized lower receivers of the firearms as a model designation. Consequently, a preliminary injunction would not require the destruction of the underlying firearms or the scrapping of expensive inventory. Defendant would merely be required to update its packaging, website, and digital marketing assets to remove the infringing name. Defendant remains free to sell the underlying hardware under a non-infringing name. Thus, the hardship imposed by an injunction is minimal and administrative, whereas the harm to Plaintiff is existential.

134.    **Public Interest:** Finally, the public interest is served by preventing consumer confusion and protecting the intellectual property rights of innovators against predatory corporate aggregation. As the Fifth Circuit noted in *American Rice*, the express statutory intent of the Lanham Act is "to prevent fraud and deception in such commerce." *American Rice*, 518 F.3d at 339 (quoting 15 U.S.C. § 1127). By enjoining Defendant's infringement, this Court ensures that consumers in the high-end firearm market are not misled regarding the true source, origin, and engineering lineage of the components they purchase.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alan Blecher respectfully requests that this Court enter Judgment in his favor and against Defendant NEMO Arms, Inc., granting the following relief:

## A. Declaratory Relief:

1.  A declaration that Plaintiff Alan Blecher is the Senior User and rightful owner of the MONGOOSE trademark and associated Trade Dress.

2.  A declaration that Defendant's use of the MONGOOSE mark and Trade Dress constitutes trademark infringement, unfair competition, and false designation of origin under 15 U.S.C. § 1125(a).

3.  A declaration that Plaintiff's use of the mark does not infringe any rights of Defendant.

4.  A declaration that Defendant is permanently barred from registering the MONGOOSE mark with the USPTO due to Plaintiff's superior priority.

41

## B. Injunctive Relief (15 U.S.C. § 1116):

5. A preliminary injunction enjoining Defendant, its officers, agents, affiliates (including 2A Armament), and employees from using the mark **MONGOOSE**, the "Ethnocentric" Trade Dress, or any other confusingly similar designation in connection with the manufacture, sale, or advertising of firearms or firearm components.

6. A permanent injunction forever enjoining Defendant from the same acts listed above.

7. An order requiring Defendant to recall and remove the infringing mark from all websites, social media, marketing materials, and physical inventory.

## C. Monetary Damages (15 U.S.C. § 1117):

8. An award of Defendant's **profits** derived from the sale of infringing MONGOOSE products (to be proven at trial).

9. An award of **actual damages** sustained by Plaintiff.

10. An award of enhanced damages up to **three times the amount of actual damages** pursuant to 15 U.S.C. § 1117(a), as actual damages alone are inadequate to compensate Plaintiff for the willful, intentional destruction of goodwill and the predatory 'ghosting' strategy employed by Defendant.

## D. Attorneys' Fees and Costs:

11. An award of Plaintiff's reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a), as Defendant's conduct in "ghosting" the Plaintiff after notice constitutes an "exceptional case" of malicious and willful infringement warranting fee shifting under the statute.

12. All costs of court.

42

**E. Other Relief:**

13. Such other and further relief, at law or in equity, as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: January 5, 2026

Respectfully submitted,

/s/ Alan P. Blecher

**ALAN P. BLECHER, ESQ.**

Plaintiff, Pro Se

411 Walnut St, 19810

Green Cove Springs

FL, 32043

5612621948

alanblecher@gmail.com

**VERIFICATION**

I, ALAN BLECHER, of full age, hereby certify and declare as follows:

43

The matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding, and no other action or proceeding is contemplated.

I am not aware of any other parties who should be joined in this action at this time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 5, 2026

/s/ Alan P. Blecher

**ALAN P. BLECHER, ESQ.**

Plaintiff, Pro Se